383 P.2d 745

The STATE of Arizona, Appellee,

v.

Blas PEREZ, Appellant.

No. 1248.

Supreme Court of Arizona,

In Division.

July 3, 1963.
Rehearing Denied Sept. 17, 1963.

Gibson & Gibson, Phoenix, for appellant.

Robert W. Pickrell, Atty. Gen., Stirley Newell, Asst. Atty. Gen., and Charles N. Ronan, County Atty. of Maricopa County, for appellee.

STRUCKMEYER, Justice.

Blas Perez was convicted of manslaughter in the death of one Luis Lopez. He appeals from the verdict, the judgment, and from the lower court's denial of his motion for new trial. His co-defendant, Tony Zamora, was convicted of second degree murder. Appellant's assignments of error present but one question. Was there sufficient evidence introduced at the trial to support a conviction of the manslaughter charge?

It is the cardinal rule that on an appeal from a criminal conviction we must take the evidence in a light most favorable to the state and resolve all conflicts in the evidence in favor of upholding the jury's verdict. State v. Izzo, 94 Ariz. 226, 383 P.

2d 116; State v. Rivera, 94 Ariz. 45, 381 P.2d 584; State v. Milton, 85 Ariz. 69, 331 P.2d 846. The evidence viewed as the jury could have found it supports these facts:

On June 25, 1961, appellant Perez, Tony Zamora, Pablo Madril, and Alex Ortega went to the Truck Stop Tavern in Guadalupe, Arizona. Prior to entering the tavern they were seen together in an automobile by one Ambrosio Lopez, Sr., brother of the deceased, Luis Lopez. He testified in part:

"A They were sitting in the car and they were just talking in the car, I guess, and they—

"Q Well, now, 'they.' Who do you mean by 'they'?

"A Well, the four boys, Pablo Madril and Cano and Tony and Alex Ortega.

"Q Was Blas Perez there?

"A Yes, Blas Perez sitting by the steering wheel."

The boys entered the tavern together. Ambrosio Lopez, Jr., an eyewitness to much of the incident, testified:

"Q Who was in that car?

"A Perez and Tony and Ortega and Madril.

\*    \*    \*    \*    \*    \*

"Q What happened when the car got there?

"A The boys went inside."

After they entered the tavern, they asked a bartender, one Daniel Maldonado, to open a quart of beer for them. He refused believing that they were minors. Tony Zamora, co-defendant of Perez, then commenced the disturbance out of which the homicide occurred by pulling a knife and making threatening gestures and statements to Maldonado. The young men refused to leave voluntarily and were forced out. Maldonado testified:

"Q   Now, what happened at that time?

"A   No, they told me to open it, and I didn't want to open it for them. And they said, 'we are going to do it by force.' And I said I couldn't open it.

"Q   What, if anything, did Zamora do?

"A   He took out a knife and pointed at me in this manner.

"Q   What happened at that time?

"A   Then Luis Lopez saw it and came over to put them out.

"Q   Now, why wouldn't you open that beer?

*   *   *   *   *   *

"A   Because they were minors."

Zamora's testimony corroborates the fact that they were involuntarily put out of the tavern:

"Q   All right, go ahead and tell us what happened.

"A   Then from there, well I told him [Luis Lopez], you know, I used to drink there all the time.

"He said, 'Well, I think you guys better go out,' you know.

"And then we came—were starting to go out, and then he started pushing me.

"And then I told him not to push me, see? Well, he pushed me out, and then I was standing in the door. He pushed me again. And then I pushed him back. And then is when he hit me. Yes, he hit me."

The testimony of Ambrosio Lopez, Jr. and Ambrosio Lopez, Sr. develop what happened. Ambrosio, Jr. testified:

"Q   Then what happened?

"A   Then those boys came out again.

"Q   These four boys came out?

"A   Yes.

"Q   Did they all come out?

"A   Yes.

"Q   All four of them?

"A   Yes

"Q   That includes these two defendants?

"A   Yes

"Q   And did your uncle come out, too?

"A   Yes

"Q   And where were they at that time?

"A    At the porch.

\*    \*    \*    \*    \*    \*

"Q    Will you tell us what happened?

"A    Then Tony pushed my uncle.

\*    \*    \*    \*    \*    \*

"Q    Pushed your uncle and then what happened?

"A    Then my uncle kicked him.

"Q    Then what happened.

"A    They started to fight.

"Q    Then what happened.

"A    They fought a while and then Pablo handed the knife to Tony.

"Q    Pablo did what?

"A    He handed a knife to Tony.

"Q    \* \* \* And what did Tony do?

"A    Got the knife and stabbed him on the back.

"Q    Who did Tony stab?

"A    My Uncle.

"Q    Did you see this?

"A    Yes

"Q    \* \* \* Then what happened?

"A    Then they fought a little while with Tony and Ortega, and they left my uncle alone.

    "Then my uncle went—was going around the cars to get in the tavern. Then Perez and Madril surrounded him and knocked him down, and started to kick him and hit him on the face.

"Q    This was after he had been stabbed.

"A    Yes.

"Q    Did you see your uncle at that time?

"A    Yes

"Q    Did you see any blood?

"A    Yes

"Q    Where was the blood coming from?

"A    Out of his mouth.

"Q    Now, you stated that Perez here kicked him?

"A    Yes

"Q    Was your uncle down at the time?

"A    Yes

"Q    Do you recall how many times Perez kicked him?

"A    No

"Q    Well, was it more than once?

"A    Yes.

\*    \*    \*    \*    \*    \*

"Q    Now, when Tony stabbed your uncle, where was Perez—or Perez?

"A    He was standing alongside of a car.

"Q    Was he watching?

"A    Yes

"Q What was he watching?

"A The fight.

"Q Did he watch while Zamora stabbed your uncle?

"A Yes

Ambrosio Lopez, Sr. testified:

"Q What did you see when you went outside?

"A Well, I found my brother bleeding to death.

"Q Was anybody hitting him?

"A They were—was surrounded by these four boys.

"Q Their names? We will have to be more specific for identification.

"A Pablo Madril in front of him on the left-hand side, and there was Alex Ortega in front of him, and there was Tony Zamora behind him, and Blas Perez.

"Q What was Zamora doing?

"A Well they were fighting. They were hitting him.

"Q They were hitting him?

"A Yes

"Q What was Perez doing with his fists?

"A Well, he was in action too.

"Q In the action?

"A Was fighting too, yes.

"Q Did you see your brother at that time?

"A Yes.

"Q Would you describe what he looked like at that time?

"A Well, he was sort of leaning down like, he is bleeding, and they are—with his arms like this.

"Q I see. Where was the blood coming from?

"A From his mouth and his chest and some of his back."

From this testimony the jury was justified in believing that from the time of the unlawful attempt to gain service in the tavern the juveniles acted in concert in a breach of the peace and in continuing to act in concert carried out the brutal and deadly assault on Luis Lopez. The jury could have believed that Perez, although not physically participating in the action at the moment the fatal wounds were inflicted, saw the knife passed to Zamora, saw the stabbing and instead of withdrawing in an attempt to disassociate himself from the consequence continued his participation in the breach of peace he had concurred in from its inception inside the building.

█ The argument advanced by appellant that the evidence is insufficient to convict him as a principal in the homicide has no merit.

A.R.S. § 13–139 defines principals:

"All persons concerned in the commission of a crime whether it is a felony or misdemeanor, and whether they

directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, * * are principals in any crime so committed."

We said in State v. Roberts:

"To aid and abet means simply to assist in the commission of an act, either by an active participation in it or in some manner advising or encouraging it." 85 Ariz. 252, 336 P.2d 151.

It is clear from the facts that the jury could have found active participation in the commission of the homicide.

■ Perez was charged and tried as a principal for the crime of second degree murder. The jury had submitted to it six forms of verdict, two of guilty of second degree murder, two of guilty of voluntary manslaughter, two of not guilty, in each instance one verdict for each defendant. It found Perez guilty of the lesser included offense of voluntary manslaughter, when the facts would have supported a conviction of second degree murder. Such is solely within the prerogative of the jury. State v. Parsons, 70 Ariz. 399, 222 P.2d 637; Mapula v. Territory, 9 Ariz. 199, 80 P. 389; Rule 295, Rules of Criminal Procedure, 17 A.R.S.

The judgment is affirmed.

BERNSTEIN, C. J., and JENNINGS. J., concur.